No. 19.—ZACHARIAH M. WINKLER *vs.* AMOS SCUDDER.

By the common law of England, of force in this State, under our adopting statute of February, 1784, all *sane* persons are competent to testify, unless *interested* or *infamous.*

The maker of a note (who is released) is a competent witness to prove usury in its consideration, in a suit by an endorsee against an endorser.

In a plea of usury, the *amount* of the original loan, and the *time* when it was negotiated, as well as the *amount* of usury taken and reserved, are material facts.

It is the right of a plaintiff to demur, at law, to a plea, for want of sufficient fullness, before issue joined upon it before the jury. The practice under our judiciary act of 1799, has been to demur orally—not formally, and in writing, as in England—nor is the judgment of the court upon such demurrer formally pronounced and recorded with us, as in the English courts.

This was an action brought against the defendant, as endorser of a promissory note made by Joseph R. Thompson, dated 7th of January, 1842, and due 61 days thereafter, for $600. The defendant pleaded that he had endorsed this note for the accommodation of the maker, and that it was given in renewal of a former note made by Thompson, and endorsed by defendant for his (Thompson's) accommodation; that Thompson delivered the original note, and those successively taken in renewal, including the one in suit, to the plaintiff; and that the plaintiff took and received upon the original note, and upon each succeeding note in renewal, three per cent. per month, interest, and that the interest so received amounted to the sum of $400.

At February Term, 1846, this cause was tried before Judge Fleming, in the Superior court of Chatham county. The note sued on, with the defendant's endorsement thereon, having been read to the jury in evidence, the plaintiff's attorneys closed their case.

On the part of the defendant, Joseph R. Thompson, the maker of said note, was then offered as a *witness* for the purpose of proving the facts alleged in the plea, and that he passed the note to the plaintiff upon the usurious consideration alleged. At the same time, a general release from the defendant to the witness, of all causes of action whatever, and also the discharge and certificate in bankruptcy of the witness, were tendered in evidence, to obviate all objections to the witness, on the score of interest.

The plaintiff's counsel objected to the competency of the witness to prove the usury, on the ground that a party to a negotiable instrument shall not be permitted to invalidate it, or to show that it had a taint when it passed out of his hands; and contended, that even if the rule of Walton & Shelly should be confined to *the case of a note in the hands of an innocent holder*, yet, that as the note in this case imported consideration, *prima facie*, and there was no evidence yet to the contrary, and that even admitting that Thompson could be a competent witness, when it had been proved, *aliunde*, that the plaintiff was not an innocent holder, yet as the witness was rendered incompetent by the *aliunde* proof, he could not be admitted either on the *voire-dire*, or *in chief*, to remove it; that a witness

cannot make way for his testimony in chief, by taking his case out of a rule which, *prima facie,* furnished a valid objection to it.

Which objection of the plaintiff's counsel was overruled by the court below, and Thompson was admitted, and gave testimony in said cause, proving the said note to have been infected with usury when he passed it to the plaintiff. To which decision of the court below the plaintiff excepted.

After closing the testimony on the part of the defendant, it appeared that there was a variance between the defendant's proof and his plea; that neither of the pleas corresponded with the amount or the time of payment of the usury proven, and on that account the plaintiff's counsel insisted that the said testimony should be ruled out, and moved the court to that effect, which motion the court below overruled, and the plaintiff's counsel excepted.

The plaintiff's attorneys then argued to the jury, that even under the testimony of Thompson, the plaintiff was entitled to recover the principal of said note; that the payments made were on account of interest, and not of principal; that although neither the witness, nor Scudder, the defendant, could have been made to pay said usurious interest, nor could the legal interest have been recoverable at law; yet, inasmuch as it had been voluntarily paid, neither Thompson, the witness, nor Scudder, the defendant, could recover it back. That the defendant could not certainly recover it back, inasmuch as he had never paid it. That it could not be allowed that Scudder, the defendant, should have the right to the deduction in this case, and then that Thompson, the witness, or his official assignee, could also recover it back. And asked the court below so to charge the jury. Which was refused; but left to the jury to say what part of the principal sum had been paid. And the jury deducted all the sums paid by the witness, Thompson, for interest, from the principal sum, and only rendered a verdict for the plaintiff for the balance of the principal. To all which the plaintiff's counsel excepted.

And now, in the Supreme Court, the plaintiff assigns as errors in law, the said decisions and charge of the court below, and prays judgment, &c.

R. M. CHARLTON and L. S. DE LYON, for plaintiff in error.

Mr. De Lyon made the opening argument in behalf of the plaintiff.

WILLIAM LAW and MULFORD MARSH, for defendant.

Mr. MARSH, for defendant, argued as follows:

This was an action tried in Chatham Superior Court, January Term, 1846, before Judge Fleming, founded upon a note endorsed for Joseph R. Thompson, of which the following is a copy:

$600                                                    Savannah, 7th May, 1842.

Sixty-one days after date, I promise to pay to the order of Amos Scudder, Six Hundred Dollars, for value received.

Cr. the Drawer,                                         J. R. THOMPSON.
    A. SCUDDER.
        Endorsed Amos Scudder.

The defendant pleaded that he had endorsed this note for the accommodation of Joseph R. Thompson, and that this note was given in renewal of a former note, made by Thompson and endorsed by defendant for Thompson's accommodation—that Thompson transferred the said original note and those in renewal of said note, including the one in suit, to the plaintiff, and that the plaintiff took and received upon the original note and upon each note in renewal, three per cent. per month interest, and that the interest so received amounted to the sum of four hundred dollars, and that the plaintiff could only recover the balance of the principal—the whole interest being forfeited.

And in support of his several pleas, he offered the maker, Joseph R. Thompson, to prove that defendant endorsed the note for the accommodation of Thompson, and also to prove the usury, as pleaded.

Plaintiff's counsel objected to the competency of Thompson as a witness, on the ground that a party to a negotiable note should not be received as a witness, to prove that the note which he put in circulation was tainted with fraud in his hands, when he passed it away ; the court overruled the objection, and plaintiff's counsel excepted, and relied on the cases *Walton* vs. *Shelly*, 1 *Rep.* 296 ; *Bank U. S.* vs. *Dunn*, 6 *Peters Rep.*, 51 ; and a few other decisions in the Supreme Court, U. S. The last in the case of *Henderson* vs. *Anderson*, 3 *Howard Rep.*, 73, affirming the case of Walton and Shelly as the law of that court.

The case of *Churchill* vs. *Suter*, 4 *Mass. Rep.*, 156 ; *Winton* vs. *Saidler*, 3 *John. Cases*, 185, and some few other authorities.

The case of *Walton* vs. *Shelly* established an innovation on the common law ; at common law every person not a party to a case, nor interested, nor infamous, is a competent witness.—3 *Bl. Com.*, 369; 1 *Phil. Ev.*, 18 ; 1 *Greenleaf on Ev.*, 376.

This maxim of the civil law adopted by Lord Mansfield in the case of Walton and Shelly does not apply—" nemo allegans suam turpitudinem audiendus est ;" viz : no man setting forth his own depravity is to be heard.

Has the witness offered committed any act of depravity ? He had violated no laws. The plaintiff had committed the act of depravity, he had violated the law by taking usury, and yet asks that the witness's mouth may be sealed to hide his own depravity.

Even the principle of particeps criminis does not apply, for witness could have sued for and recovered back the usury if he had paid the note, which could not have been done had he been *particeps criminis*.—5 *Law Lib. Com. on Usury*, 80 *and* 81, (see 6 *East* ; 241 *Cowper*, 200, 790 ;) *Clarke* vs. *Shee*.

But this rule as laid down in Walton and Shelly in 1786 was overruled, in the case of *Jordaine* vs. *Lashbrook*, 7 *Term Rep.* 604, in 1798, and from that day to this it has never been the rule in England, and long since then, they have by statutes made all persons competent witness unless parties to the case.—*Statutes* 6 *and* 7 *Vict. C.* 85, *Sec.* 1 ; *Arch. Ni. P. Law Lib.*, *July No.* 1845, *page* 29, *and see page* 30.

This rule, established by Lord Mansfield, the great commercial lawyer and Judge, for the benefit of commerce and commercial paper, lived a sickly life of only 12 years, and since then in that great commercial country, the courts have adhered to the common law, enlarged by Statutes of 6 and 7 *Vict.*, so that no person not a party to the case is excluded on the ground of incompetency, and yet our court is asked to adopt this repudiated rule of Lord Mansfield.

In some of the States the rule of Walton and Shelly was early adopted.

It was in New York in 1802, in the case of Winton and Saidler. Justices Kent and Radcliff holding the witness incompetent—3 *John. Ca.* 185.

This State is the greatest commercial State in the Union, and yet we find they have entirely repudiated the rule of Walton and Shelly, and declare it not law.—*Tuthill* vs. *Davis*, 20 *John Rep.*, 285 ; *Powell* vs. *Waters*, 17 *John Rep.*, 176 ; *Barret*

vs. *Snowden*, 5 *Wend.*, 185; *Williams* vs. *Waldbridge*, 3 *Wend.* 415; *Bank of Utica* vs. *Hilliard*, 5 *Cowen*, 153; *Stafford* vs. *Rice*, 5 *Cowen*, 23; *Starkweather* vs. *Matthews et al.* 2 *Hill Rep.*, 131. The maker of an accommodation note was admitted in behalf of his endorsers, on being released from costs, to prove usury. This was in 1841.

In the case under consideration the witness was released not only from the costs, but from the debt by defendant, and his discharge under the Bankrupt Act of 1841, was also in evidence.

In Massachusetts, a State perhaps nearly equal to New York in commerce, the courts have also repudiated the rule, unless the note be in the hands of an innocent bona fide holder.—*Fox et al. Admr.* vs. *Whitney Admr.*, 16 *Mass.* 118.

*Vanshaack* vs. *Stafford*, 12 *Peck*, 565; Case directly in point. In this case, the accommodation endorser was sued, and the maker held competent to prove usury between the plaintiff and maker, from whom plaintiff received the note.

In South Carolina the rule of *Jordaine* vs. *Lashbrook* prevails—3 *M'Cord*, 71 ; *Wright* vs. *Packard;* *Smith* vs. *Admr. Cherry*, 1 *Hill Rep.* 148; *Smith* vs, *Dow*, *Mil. Con. Rep.*, 277. In New Jersey the same rule prevails, and to prove usury. *Freeman* vs. *Brittin*, 2 *Harrison Rep.*, 192. So in Virginia—*Taylor* vs. *Beck*, 3 *Rand*, 316; (2 *Cow., Phil. on Ev., Note* 78, *page* 78.) And in Vermont—*Same note*, 2 *Aik. Rep.*, 138. Connecticut—*Same note*, 1 *Conn. Rep.*, 260. Maryland —*Same note*, 3 *Har. and John.*, 172; 4 *Har. and John.*, 283. Kentucky—*Same note*, 1 *Munroe*, 23.

Thus we see the courts of these States having commercial interest, repudiating this obsolete rule of Walton and Shelly. Obsolete, at least, in the court that first adopted it; and yet this court is asked to hold it to be the law of Georgia.

But this question is settled by the law-making power in Georgia. By the Act of 1784, the common law and statute law of England were adopted, such as were in force on the 14th May, 1776.

The common law, as it was known and recognized by the courts of Great Britain on the 14th May, 1776, held all persons, not parties, nor interested, nor infamous, competent witnesses, as we have seen.—3 *Blk. Com.* 369 ; 1 *Phil. Ev.* 18; 1 *Greenleaf*, 376.

And this being adopted by the Act of 1784, remains the law of Georgia, unless repealed or otherwise altered by the Legislature.—*Prin. Dig.*, 570.

The rule in *Walton* vs. *Shelly* was made in 1786, two years after the adopting statute—and was overruled in the case of *Jordaine* vs. *Lashbrooke* in 1798.

So that the case of *Walton* vs. *Shelly* never was authority in this State, and since our adopting statute, no court in this State can adopt it without violating the statute of 1784. And also the 1st *Sec.* 1 *Art. Con.* of this State—which confines all legislative powers to the Legislature.

And such was the decision of the Judges in Convention in the case of *Slack* vs. *Moss, Dudley's Rep.* 167.

And such I apprehend has been the current of decisions in this State.

See the case of *Wendell* vs. *George*, by Judge Berrien.—*R. M. Charleton's Report*, 51.

But the counsel for plaintiff says that the evidence should have been ruled out under the pleadings. The general issue denied what the plaintiff alleged in his declaration.

The plaintiff declared that the defendant transferred the note to plaintiff, in the usual course of business, and for a valuable consideration. Defendant by the general issue denied that, and *proved it by the evidence* of Thompson, and therefore disproved plaintiff's case.

And by the general plea of usury, the defendant set forth the whole transaction, the usury taken, and from whom taken, and for what time taken, fully and distinctly enough to advise the plaintiff of the defence which at common law may be given in evidence under the general issue.—5 *Law Lib. Com. on usury* 76.

The answer fully, plainly and distinctly sets forth usury, names the unlawful interest taken, 3 *per cent. per month,* &c., and completely puts the plaintiff upon full notice of the nature of the defence.    And that is what our statute requires, that the plaintiff may not be taken by surprise.

The general plea of usury is good except on special demurrer.—5 *Law Lib.,* 77.

And even under the rule of *Walton* vs. *Shelly,* Thompson was competent to prove all that happened while the note was in his hands, because it then had no taint.    Nor did it receive any from him, but from plaintiff.—2 *Greenleaf on Ev.; Roscoe on Civ. E.* 173.

The decision of the court in admitting Thompson's testimony was clearly right, and he disproved the plaintiff's statements in his declaration, proved that plaintiff did not receive the note from defendant for a valuable consideration, nor in the usual course of trade, and he fully proved the usury as alleged in defendant's plea, and the verdict is right both according to law and evidence.

In an application for a new trial which always addresses itself to the sound discretion of the court, if upon the whole case justice has been done between the parties, and the verdict is substantially right, no new trial will be granted, although there may have been some mistakes committed on the trial.    Justice Story, in the case of *McLanahan et al.* vs. *the Universal Insurance Co.,* 1 *Peters' Rep.* 183.

In this case full and ample justice has been done.    Plaintiff has a verdict for all he is entitled to under our laws, and surely this court will not, by requiring from a security a strictness in pleading, with which, from a want of knowledge of the facts, he cannot comply, compel him to pay usury extorted from the principal, and thus aid the usurer in violating the law,

Securities always have a favorable standing in court, and are entitled to all the privileges of the principal, and may plead usury or make any defence the principal can.—5 *Law Lib. Com. on usury,* 76.

*Bank U. S.* vs. *Winston Exr.,* 2 *Brockenborough,* 252 *; Theobald on Security,* 253, 254, (see *Cooper,* 61.)    This doctrine is laid down in the case of *Wright* vs. *Morley,* 11 *Ves.* page 22, by Sir Wm. Grant, Master of the Rolls.

The plaintiff could have denied the plea under his oath and have been a witness; this he refused, and we submit if this be not an admission of its truth.— 1 *Phil. Ev.* 107.

Our statute only requires such a plea as will fully advise the plaintiff of the nature of the defence.    Surely this was done; and the defendant may rely on all his pleas.

We think we have fully sustained the following points :

1st.  That a party to a negotiable note is a competent witness to prove usury in the hands of the person taking usury—he not being a *bona fide* holder.

2d.  That in this case plaintiff received the original note and those in renewal of such note, including the one in suit, from the witness, (Thompson the maker,) and upon each note took from Thompson 3 per cent. per month interest, contrary to law.    And that Thompson is a competent witness to prove these facts.

3d.  That the pleading on the part of the defendant fully notifies the plaintiff of the nature of the defence, so that he could not be taken by surprise.

4th.  That full and ample justice has been done the plaintiff in this case by the verdict, which gives him all he is entitled to by law—and that this court ought not to grant a new trial.

WM. LAW for defendant in error.

By the established rule of evidence at common law, all persons are *competent* to give evidence unless *interested* or *infamous.*

*Interest* and *infamy* are, in other words, exceptions to the general rule, that all persons of *sane* mind are competent to testify.—1 *Phil.* 18.

To these two exceptions, another was added in England in the year 1786, viz : that a party to a negotiable security, or instrument, could not be a witness to impeach its validity.

This exception was first established in the case of Walton and Shelly, (1 *Tm. Rep.* 296,) and originated in an idea that it was to *assist commerce and discourage fraud.*—See the case and 4 *Mass. Rep.* 156.

It is obvious here to remark, that this exception did not exist in England, when the common law was adopted in Georgia, but was introduced twenty years after. Hence, there is no *obligation* upon this court to adopt it; and it should not be adopted unless strongly commended by its obvious propriety and necessity, for the very reason that it is an *exception* to a general rule.

It is obvious further to remark, that this same exception was rejected and exploded in England within ten years after its introduction, and questioned in the earliest succeeding case.—See *Bent* vs. *Baker,* 3 *Tm. Rep.; Jordaine and Lashbrooke,* 7 *Tm. Rep.*

But it is said to be an exception designed to *assist commerce and discourage fraud;* and yet England, where the exception was so early rejected, is the most *commercial* nation in the world; and the common law of England abhors *fraud* in every form.

It would be strange, that in such a country, and with such a common law, an exception standing on the ground on which this was made to repose by its distinguished author, should so immediately have been questioned, and so speedily exploded, if its introduction had not been in clear violation of existing law, and the principle on which it was rested found to be fallacious in practice. The truth is, that its application, instead of assisting commerce by discouraging fraud, was found to conceal and disguise fraud by withholding the only witnesses who in the nature of such transactions could disclose it.—See 18 *John. Rep.* 167.

The exception never was in force in Georgia,—the general rule, without the exception, was the law of England when that law was adopted. It is a hazardous undertaking on the part of the Judiciary to legislate; it becomes still more so to do it, in opposition to the lights of experience and the obvious tendency of judicial wisdom in America as well as England.

More than twelve years ago, the exception established in Walton and Shelly, was considered in convention by the ten judges of Georgia then on the bench; and the authority of that case deliberately and considerately rejected, and the exception it established declared not to be law.—See *Slack* vs. *Moss, Dudly, Rep.* 161.

The decison in that case was prepared by the late Judge Crawford. The reasoning was his—but the rejection of Walton and Shelly was in accordance with the opinion of all the Judges attending the Convention.

It is not now understood that Walton and Shelly is recognized in any Circuit in the State, save what inclinations may have been indicated during the trial of cases in this circuit.

It is to be remembered, too, that Slack and Moss was decided at a time when the exception in Walton and Shelly was supported by its unqualified adoption in some of the large commercial States of the Union, with the most enlightened Judiciary ; particularly New York and Massachusetts. The Judiciary of both these States have greatly receded from their former views on this subject. New York has denied the authority of Walton and Shelly. Massachusetts has greatly

qualified it, and is fast verging to its explosion. Indeed, in England and in this country, the most direct tendency is to let all objections to testimony go to the credit, and to limit the rule of incompetency within the narrowest points. By the English Statute of William IV., a most important legislative indication is given on this subject.

It would be strange, if, when everywhere else this *exception* in Walton and Shelly was either rejected or exploded, or being exploded by its gradual limitations, that we in Georgia, in opposition to former opinion, should be reversing the order of things by its adoption.

It will be conceded that in England, the rule in Walton and Shelly has never been recognized as law since the case of Jordaine and Lashbrooke.

When its paternal ancestry have rejected it as an unworthy and spurious offspring, shall we adopt the bantling, and like the Dutchman adhere to his illshapen four-cornered roofed house, in the midst of beauteous and splendid specimens of architecture?

I have alluded to the tendency of the decisions in our own country;—let us examine them:

In Winton *vs.* Saidler, 3 *John. Cas,* 185, the New York Court fully adopted the rule in Walton and Shelly.

The rule seems to have been continued and unbroken, or modified down to the case of Mann and Swan in 14 *John. Rep.* 270, where we see a most severe application of the rule.

It underwent some modification in Skelding *vs.* Warren, 15 *John. Rep.* 270, and 16 *John.* 70. It was further shaken and modified in Powell *vs.* Waters, 17 *John.* 176; and McFadden *vs.* Maxwell, 17 *John.* 188. And the important distinction was taken and established that the rule did not apply when the plaintiff in the action was himself the *usurer* or a *party* to the *fraud.*

And in *Myers* vs. *Palmer,* in an action against the 1st endorser, the maker and 2d endorser were held competent to prove that the note was filled up for a greater sum than was intended, the court using the strong language, " *that* the reason and policy of the rule was to protect *bona fide* holders, &c. Here the party who asks its benefit is the very person who committed the fraud. It would be a misapplication and abuse of the rule to extend it to such a case."—18 *John. Rep.* 167.

I ask the court to pause and consider here upon the case at bar. Winkler, the plaintiff, is the *usurer*—he committed the fraud upon the law—he took advantage of the pecuniary necessities of the maker, and after the note had been endorsed by the defendant for the maker's accommodation, and delivered to him, (the maker,) he discounted it for usury.

Is he that *bona fide* holder for whose protection the rule was introduced? or, in the expressive language of the New York court, is not its application to him an *abuse* of the rule? Winkler is precisely within the qualification of the rule made in that case in New York.

In *Tuthill* vs. *Davis,* 20 *John.* 287, the endorsee was admitted to prove in a suit against the maker, that the note was given to take up two other notes on which usury had been received; and thus the rule was virtually abolished.

*Stafford* vs. *Rice,* 5 *Cowen* 23, expressly overruled Winton and Saidler, and with it Walton and Shelly, and declared that they were not law. More strong yet is the case of the *Utica Bank* vs. *Hilliard,* 5 *Cowen,* 153. See also 8 *Cowen,* 669; 3 *Wend.* 415. The same adoption of the rule in Walton and Shelly marked the course of the earlier decisions in Massachusetts, until we arrive at the case of Fox and Whitney, 16 *Mass. Rep.* 118, where the same distinction is taken, and the contest being between the original parties, and not an innocent *bona fide* holder, the rule was relaxed, and the witness admitted.

And on a motion for new trial in the case of *Knight* vs. *Putnam,* 3 *Pick.* 184,

Judge Wilde says *Manning* vs. *Wheatland*, 10 *Mass.*, has been questioned. The plaintiff, he says, was the guilty party (the usurer); no deception was, therefore, practiced on him. The truth was that *Manning* vs. *Wheatland* was in effect overruled by *Fox* vs. *Whitney*. See Mr. Cowen's note to Phillipps, 2 vol. 76. But in *Van Schaack* vs. *Stafford*, 12 *Pick.* 565, the maker was held a competent witness, under precisely the same circumstances with the case at bar. In Virginia the rule of Walton and Shelly is rejected. See 1 *Hen. and Munf.* 154; 3 *Rand.* 316. This last case is worthy of perusal. In Vermont the rule is rejected. *Nichols* vs. *Holgate*, 2 *Aik.* 138, cited Cowen's note, p. 79. In Connecticut the earlier decisions followed the lead of their neighbors; but in *Townsend* vs. *Bush*, 1 *Conn. Rep.* 260, Walton and Shelly was rejected, and *Jordaine* vs. *Lashbrooke* declared to be sound law. I have this reporter, and can furnish Randolph. In South Carolina the doctrine in Walton and Shelly is entirely exploded.—See the cases collected in 2 Cowen's Notes, p. 80. In Maryland the rule is also rejected.—See 3 *Har. and John.* 172; 4 *Har. and John.* 283. I can furnish these authorities. So in Tennessee, 2 *Yerger* 35. So in Kentucky.—See Cowen's Notes, 80. So in New Jersey, 2 *Harrison* 192. In Louisiana the rule is said to be of modern date, and not settled.—5 *Martin* 130, cited Cowen 81. In Pennsylvania, New Hampshire and Maine, and perhaps Mississippi, Walton and Shelly seems to have been adopted. In North Carolina rejected.—3 *Murphy* 151. So too in Alabama.—1 *Stew.* 199; 9 *Porter* 226. In Ohio, rule undecided.

Thus stands the question in the State courts.

This brings me to the consideration of the decisions of the Supreme Court of the United States.

The authority of that court is entitled to great weight; yet its decisions are not obligatory upon this court, and will not command its blind obedience, but are to be weighed and scrutinized upon principle; and then, with due allowance for the acknowledged weight of its authority, they are to be followed or resisted according to the force of the reasoning by which it is supported, and the weight of the authorities upon which it rests and relies.

The two cases of the *Bank of the United States* vs. *Dunn*, and that of the *Bank of the Metropolis* vs. *Jones*, in 6 *Peters* 51, and 8 *Peters* 12, stand upon precisely the same ground. And they involved three points, viz.: 1st. Whether a party to a negotiable instrument was competent to invalidate it? 2d. Whether parol evidence could be received to vary or contradict a written contract? 3d. That the officers of the bank had no authority to make such contract as the witnesses in each case testified to. The court affirm the negative of the first proposition, upon the authority of Walton and Shelly. But the testimony of Car and Blake did not go to the extent of invalidating the instrument, but merely to prove a parol agreement, tending to release the endorsers from risk, in contradiction of the obligation imposed by the contract of endorsement. This raised the second point, which principally attracted the attention of the court, and which, equally with the third, was decisive of the case.

It will be seen, therefore, that there was enough in the cases for the decision without touching the first question; and that, indeed, as the first was not so obviously embraced in the facts proved by the witnesses, what was said by the court on that point has rather been considered as a dictum than the ground of the decision in the case.

Upon the point the decision is brief and unsatisfactory. The court first say that the witness is not incompetent, because his name was not endorsed on the bill.—See page 57. It then says the case of Walton and Shelly is still held to be law. I ask when and where is it held to be law?

It was expressly overruled by the Judges in Bank, in England, in Jordaine and Lashbrooke.—7 *Tm. Rep.* It has never since been recognized in England. The decisions of the Supreme Court were made twelve and thirteen years ago. Did

they allude to the earlier decisions of New York and Massachusetts ?   We have shown that they have been revised and overruled.

It is now law only in Pennsylvania, New Hampshire and Maine.

How imperfectly and superficially was this point considered by the Supreme Court, and the dictum announced when they refer to the case in 7 *Tm. Rep.*, 60, which allows the borrower in an action for usury, to be a witness, and take no notice of Jordaine and Lashbrooke, reported in the same volume, in which the very point they affirmed is denied, and Walton and Shelly expressly and by name over-ruled.

It is manifest the court did not mean to decide the case so much upon the first point as the second and third, because they say, at *page 60 of 6 Peters*, the evidence should have been overruled ; or the court should have instructed the jury that the facts proved were not sufficient in law to release the liability of the endorser.   Demonstrating the fact that they rested the case upon the insufficiency of the parol evidence to contradict the written contract.

That this view of those decisions has been taken by distinguished lawyers and jurists, is apparent from what the learned annotators to *Bayley on Bills*, 587, say, viz : that the question must still be considered an open one in that court.   These gentlemen are Willard Phillipps, the distinguished author of the great treatise on Insurance, and Judge Sewall, of Massachusetts.

When the brevity and paucity of the two decisions on a point of so much importance affecting a rule of evidence, with reference to no authority but an overruled case, in the midst, too, of so many well considered and elaborately learned investigations of the question to which these decisions stand opposed, with no notice taken of the learning on the subject—I say, when these considerations are weighed, who can fail to arrive at the conclusion that the Supreme Court rested the case on the other and undoubted points of the case, without giving to this particular one the consideration and examination which it would have received had the case stood alone on that point ?   And surely such decisions can never prevail against the accumulated weight of authority the other way.

But the Supreme Court have reiterated the dictum in 11 *Peters* and 12 *Peters*. It is still but a dictum, for in neither of those cases did the true question arise. The instruments in these cases were not *negotiable* instruments, and the court simply allude to its former decisions with the qualification that it was confined to negotiable instruments.

In the case of 11 *Peters*, the court trace the principle in England from Walton and Shelly to its explosion in Jordaine and Lashbrooke, which they admit is still followed in England.   Yet, in the case in 6 *Peters*, in which they decided the point, they affirm Walton and Shelly to be still law, without noticing Jordaine and Lashbrooke.   If anything were wanting to show the superficial character of that decision, we have it here.

The truth is, the question has never been well considered by that court.   They gave to it but little reflection and examination in the two first cases, because they had undoubted points to rest on ; and in the last they have only referred to the decision as having been made, because the point did not apply to these last cases.

In these last cases the Supreme Court itself rejects to a certain extent Walton and Shelly, which extended the rule to all instruments, and followed Bent and Baker, in 3 *Tm. Rep.*, which limited it to negotiable instruments.   And thus that court repudiated the foundation on which Lord Mansfield had placed it, viz : *Nemo allegans suam turpitudinem audiendus est ;* and adopted the more sensible rule of the policy of the law in protecting an innocent holder of a negotiable paper. The qualification necessarily produces this result, since the maxim of the civil law applies to *every species* of instruments.

I do not doubt, when that court shall be called on again *directly* to decide the point, as the entire or alone ground of the case, the rule will undergo further

modification and be expressly restricted to innocent parties, holders, and finally exploded as it has been in New York, Massachusetts and Connecticut, overruling their own former adjudications.

This is the tendency of jurisprudence throughout the world, where the common law is known.

But as the restriction of the rule by the Supreme Court, in 11 *Peters*, to negotiable securities, and consequently the rejection of the civil law maxim as its basis, becomes all important to the argument I am about to raise, I ask the particular attention of the court to what the Supreme Court say at *page 95*, 11 *Peters:*

" The principle settled by the court, goes to the exclusion of such evidence only in regard to negotiable instruments *upon the ground of the currency given to them by the name of the witness called to impeach their validity.*"

In other words, you have certified to the validity of this paper by putting your name on it; an innocent holder has trusted to that assurance, and you shall not impeach it.

Or in the yet clearer language of the court, in 18 *Johns.*, 167; the reason and policy of the rule is to protect *bona fide* holders of *negotiable* paper, honestly received in course of business.

This is the obvious qualification of the rule by the Supreme Court in 11 *Peters.*

But as my learned opponent has, to my surprise, referred, as he says, to the decisions of the Supreme Court, not to establish the rule in Walton and Shelly, but to show that that court put it on the civil law maxim or ground, let me apply a *test* for the purpose of ascertaining beyond controversy, upon what ground that court does put the rule. The civil law applied the maxim *nemo allegans, &c.*, to all instruments; Walton and Shelly does the same; but the Supreme Court expressly limit it to *negotiable* instruments. Now, the inquiry is, why this limitation ? As between the original parties, there is no reason why the rule should not be as applicable to a bond as a note, or bill of exchange; but as notes and bills of exchange are commercial papers made to circulate and pass in business from holder to holder, the limitation of the rule, and confining its application alone to such instruments, indisputably proves that its object was the protection of *bona fide* holders for valuable consideration, without notice. The very restriction, therefore, put on the rule by the Supreme Court, necessarily involves as its basis the policy of the law in protecting innocent holders; and as certainly rejects the more enlarged foundation of the civil law, and on which Lord Mansfield had put it.

I presume, therefore, whatever the language of the Supreme Court may have been, there can be no mistaking their meaning when they say they exclude " such evidence *only* in regard to negotiable instruments," &c.

The corollary deduced from the limitation is as irresistible as the language is plain and certain in which that limitation is couched.

I have been thus particular on this point, because, if we have arrived at a sensible and true understanding of the rule as adopted by the Supreme Court, and the American courts generally, where the rule has, or now obtains, then we present the following argument, which we think ought to be conclusive of the question in the courts of Georgia.

Our argument is, that under the laws of Georgia, the rights of third parties, innocent *bona fide* holders, cannot be involved in this question, nor in the slightest degree affected by its decision.

That proposition being established, the prop which supports the rule according to the American cases, will have been removed from beneath it—and *cessante ratione, cessat et ipsa lex.*

It will, of course, be perceived that our argument is confined to the application of the rule to the case at bar,—to a case in which the defence is *usury*, and the witness offered to prove *usury*.

Our proposition is, that under the Usury Act of Georgia, of 1822, (*Prin. Dig.* 295,) the innocent *bona fide* holder of a bill or note may recover the whole amount of the face of the paper, principal and interest, although usury may have infused itself into the veins of the contract, provided the holder did not know of it when he took the bill.

The Act of our Legislature declares that the usurious contract shall not be void, and contents itself with denouncing, as a penalty upon the usurer, the forfeiture of the interest.   It is upon the guilty party, and him alone, that this penalty falls.

To make this plain, I proceed to illustrate the argument.

By the English statute, and by those of many of the States, the usurious contract is declared to be null and void.   When the question came up in England, whether an innocent holder could recover on such a contract, the judges struggled to relieve him, but they declared that the words of the statute were *too strong*, —the contract being declared *void*, there was nothing for him to recover on.—See *Lowe* vs. *Waller*, *Doug.* 736.   Lord Mansfield said he was constrained to the decision by *Bowyer* vs. *Brampton*, 2 *Strange*, 1155, on the gaming statute.

This decision in England was followed by the statute 58, George III., which declared that no bill or note, or contract usurious, shall be void in the hands of an innocent holder for valuable consideration without notice of the usury.

In the mean time the Judges availed themselves, in behalf of innocent parties, of every ground by which they could escape the mandate of the former statute.   Thus in *Ellis* vs. *Warnes*, *Cro. Jac.* 32, (which I have,) they decided that a security given by the borrower to a person *not privy* to the usurious agreement, and to whom the lender is *indebted* in so much money, shall not be avoided by the usury.

So, in *Cro, Eliz.* 642, where a surety joins in a security, and a counter security is given by the principal, such counter security is good, notwithstanding the former security was usurious.

So, if a security tainted with usury be given up in the hands of a third party, for valuable consideration, without notice, and a new security taken, the latter is good.—8 *Tm. Rep.* 390.

So, if a bill or note usurious be endorsed for a *valuable consideration* to one *ignorant* of the *usury*, it is good between the endorsee and endorser, although void between the endorsee and drawer, or maker—because the endorsement is a new contract.—1 *Salk.* 125, 133, 344; *Ord on Usury*, 108-9.

These authorities will suffice to show how the courts in England struggled for innocent parties, before the 58, George III., and against the strong language of the prior statutes, declaring the contract *void*.

In New York, before the revised statutes, the contract for usury was void, with no saving to innocent holders.   Yet Chancellor Kent, (in 10 *John. Rep.* 197-8,) reviewing the course of the English cases, protected an innocent purchaser at public sale, under an usurious mortgage.

In Virginia, the usurious contract is also void.   Yet Chief Justice Marshall held, that where an agent borrowed money from his principal, in that State, at usurious interest, he would not let the agent benefit, and decreed payment of principal and lawful interest.—1 *Brock. Rep.* 115; *Short* vs. *Skipwith.*

But we are not without direct authority on this point.—See *Bailey on Bills*, 573, 574; *Gould* vs. *Armstrong*, 2 *Hall*, 266; *Vallet* vs. *Parker*, 6 *Wend*. 615; 3 *Cains*, 279; *City Bank, New York*, vs. *Barnard*; 1 *Hill*, 70; *Chitty on Bills*, 81, 82, old *Ed.*

See particularly the case in 6 *Wend.* opinion of the court at pages 619, 620.

In New Hampshire, the maker of a note cannot set up usury in an action by a *bona fide* holder, the statute of 1791 not declaring the contract void, but prohibiting usurious interest.—2 *N. Hamp. Rep.* 410.

This is so analogous to our statute as to point infallibly to *its* proper construc-

tion on this point. It may be asked, whence the decisions in Massachusetts, South Carolina and New York, against innocent holders?

My reply is, that when those decisions were made, in each of those States, the statute rendered the contract void. Now, the law of Massachusetts and South Carolina does not render the contract void. The South Carolina act is a transcript of ours. And in New York, by the revised statutes, usury is no defence on a bill or note in the hands of a *bona fide* holder for valuable consideration.

Now, if the court please, will it contemplate the course of decisions in the foregoing States, on the very question at bar, since the above change in their statutes?

They have overruled all their earlier decisions, and the witness is admitted in each of them. I do not say that they have expressly put the change on this ground; but when the innocent party was protected, the reason of the rule having ceased, and the testimony operating only against the guilty, the rule was *immediately modified*, and it was declared an abuse of the rule to apply it to the protection of the guilty.

But let us pursue this illustration a little further.

By the Act of 1842, Pamphlet 168, where the usurer brings his action, he may be required to state by affidavit, and be examined as a witness, to the truth of the plea of usury; and if he refuses, the defendant may do the same.

If Winkler, the guilty party, and plaintiff in this action, had sued Thompson, he could have been made to testify, and if he refused, Thompson could have been a witness in his own case.

Yet you will so harshly apply a law, rejected in England, never adopted by the Legislature of Georgia, repudiated by all the judges in 1832, rejected now by three-fourths of the States, and expressly limited in favor of innocent parties by the Supreme Court, by the limitations they put upon it—I say you will apply this law so harshly as to deny to an innocent endorser, defendant in an action, the benefit of testimony which, under the Statute, the maker could give, or force to be given, in his own case.

Massachusetts has adopted recently a similar Statute with our own on this subject. Everywhere, in England, in these States, by local legislation and State judicial decisions, the tendency of the law is onward in its progress to the detection of fraud in this particular.

Will this court throw itself back upon Walton and Shelly, and by an unqualified application of its rule obstruct this progressive movement in Georgia?

How different is the position of this court from that occupied by Lord Mansfield in the time of Walton and Shelly. Then England had just emerged, in her industrial pursuits, from the tillage of the ground to the commerce of the world; her path was on ocean deep—she stretched her arms, Briareus like, to grasp within her embrace the four quarters of the globe.

Her great Chief Justice felt the change, and he sought to engraft upon the common law those principles of the civil law adapted to her new position. He was happy in much that he did—he erred in some. The cooler judgment of his successors pruned the exuberances of his fertile genius, and, among others, speedily lopped off this famous branch, this exception to the established Law of Evidence, and again enabled the Judiciary of the country to repose on its ancient, sure and well-defined rule.

But what is your Honors' position, and why should you innovate? Surely the rule of evidence which satisfies the commercial demands of England may suffice the wants of America; especially when that rule has become hoary and venerable by time and experience.

How different, too, your position from the Supreme Court, U. S. They have attempted to introduce principles of the civil law: it is becoming a favorite with

that court. They have no positive inhibitions. But your Honors are bound to the common law, by our adopting Statute, so firmly that you cannot sever the ties without doing violence to the Statute Book on whose page it is written : " The common law of England, as it existed in 1776, shall be the law of this State," &c.

True, there is one exception—a proviso as to its *applicability* to our institutions. But I submit, what is there in the ancient rule of the common law on this subject inapt to the genius and institutions of our country ?

Will not Liberty repose as securely enthroned, whether the credibility of a witness be weighed by a jury or his competency be decided by the court ? Indeed the former is more of kindred with our institutions than the latter; and by her recent Statute monarchical England has yielded more obeisance to popular sensibility on this subject than republican America. Where did Phillipps and Sewall obtain their information, in 1836, when they published their edition of Bayley on Bills, that this question was still an open one in the Supreme Court, U. S. ? They are citizens of Boston, and were neighbors of the late learned Judge Story.

And if your Honors will appreciate his views of the decisions of the Supreme Court, and of this point, turn to his own decision in the Circuit Court, where he admitted a grantor to a deed, if not otherwise interested, to be competent to prove fraud in the deed, and where he says, " *I understand it to be settled in many States, contrary to the doctrine now established in England, that a party to a negotiable note or bill shall not show it originally void.*" This was in 1835. The case in 6 Peters was in January, 1832. Yet the judge says he *understands* it is settled in *many States*—not an allusion to the Supreme Court, nor to the question as being *settled* there, but to that court he was amenable, and to it he would have referred if he had regarded the question as settled there. The judge goes on further to say that the principle has not been applied even to all negotiable instruments.—See 2 *Sumner*, 235.

If we must have Walton and Shelly, let us not take the imperial edict in its totality, but let it be modified by the lights of experience, by the dictates of reason, by the policy of protecting the innocent. Let it not come to us a cloak and cover and disguise for fraud ; let it not, in the name of honesty, become the shield of the guilty, and the executioner of truth and justice.

Our Statute of 1842 comes like a ministering angel to the relief of the necessitous and oppressed; but this heartless rule screens the guilty, and mocks at the distressed.

If Winkler had sued Thompson, the latter could have been his own witness, under the Statute; but with the subtle cunning of fraud he pounces upon the innocent victim, who, knowing nothing of the facts of the usury himself, cannot be his own witness. He calls in vain, under the Statute, upon his pursuer, who refuses to answer; and this miserable rule of law closes the mouth of the only witness on earth who can speak to the truth, although that witness has in the case no interest to disqualify.

My attention is directed by the argument of the opposing counsel to the remark of Mr. Greenleaf, in a note to his valuable treatise on evidence, that each of the decisions against Walton and Shelly was made long before that rule was recognized by the Supreme Court, except the one in New Jersey.

That is not precisely so. The decision in 6 Peters was made in 1832. In the same year, but subsequently, Slack and Moss, in Georgia, was decided.

The case in 12 Pickering was decided in the following year, 1833. And several of the other cases preceded but a short time. If the note of Mr. Greenleaf be thought to indicate the inclination of his mind, he stands alone among the elementary writers; and Phillipps and Sewall, and Cowen and Hill, in the notes to Bayley and to Phillipps on Ev. manifest a much stronger leaning the other way.

With these remarks upon the rule of exclusion, its modification, and the pro-

priety of its application to the case at bar under our statutes of usury, I submit that question.

I am now met by an argument from my learned opponent, which demands notice rather because of the imposing aspect imparted to it by the mode of its statement, than because of any intrinsic force it possesses.

That argument is, that as the note or bill imports a valuable consideration, there must be *aliunde* proof to show that the note was not transferred for valuable consideration, before the maker could be admitted to state the facts connected with its negotiation.

We offer the witness to prove the circumstances under which the note was negotiated, the only witness in the world who has knowledge of the facts, but the argument asks us to prove those very facts by some other witness or testimony, before we shall introduce this witness; and the reason assigned is, that the witness is incompetent, and cannot restore his own competency.

But is it not perceived that this is the very question in controversy, to wit, the competency of the witness? Is not this a begging of the question? the *petitio principii* of the logician? It is arguing in a circle. My learned opponent was not insensible to the difficulty of the argument, and attempts to relieve himself by seeking refuge under the case of Walton and Shelly.

He assumes that Walton and Shelly is law, that it is applicable to the particular case at bar, and applicable to it under the Georgia Statutes of Usury. All this must be conceded, or his argument is worth nothing. But all this is disputed between us—this involves the whole controversy. In pursuing his argument, the intelligence and candor of the counsel forced him to the admission, that the whole argument rested upon the fact that the rule in Walton and Shelly prevailed; and the cases he cites from Pennsylvania furnish the argument, because in that State the rule in Walton and Shelly is recognized.

My whole preceding argument, therefore, has been an answer to this reasoning of my adversary. Reject the rule in W. and S., modify and shake it, demonstrate its inapplicability to the case at bar—and what becomes of the counsel's argument?

The superstructure must fall when the foundation is removed. This argument, then, however specious, is fallacious; and only remits us back to the very inquiries we have been all along pursuing.

The general principle, therefore, cited from the elementary works, upon the means of restoring competency, are wholly inapplicable to the present question.

If, then, we have relieved ourselves from the operation of the rule in Walton and Shelly upon any of the arguments advanced, or grounds assumed, the remaining question is, whether the witness be competent on the ground of interest, under the ancient rule of the common law?

And upon this subject, we remark, that the true test of disqualifying interest is, whether the witness will gain or lose by the direct legal operation and effect of the judgment; or, whether the record will be legal evidence for or against him in some other action.

It cannot be, and is not pretended, that the record in this case can be used either for or against the witness in any other suit.

If the interest of the witness is balanced, he is competent.

Without going through the numerous cases and examples illustrative of this proposition, let us look at once to the cases of parties to bills and notes, and in general their interest will be found equally balanced, and the witness admissible.— *Greenleaf*, 445.

And let us further take, as among parties to notes, the precise case at bar, of an action by endorsee *vs.* endorser, and maker offered as witness. In such case,

he is considered a good witness, as the books tell us, because, if the plaintiff prevail, the witness will be liable to pay the note to the defendant, and if the defendant prevail, the witness will be liable to the same extent to the plaintiff.—*See* Greenleaf, 446 ; 1 *Phil. Ev.*, 67 ; *Note by Cowen*, 117, 118, *page* 130, 131, 132 ; *Bayley on Bills*, 593 ; 16 *John. Rep.*, 70 ; 3 *Wend.*, 415 ; 10 *Wend.*, 93 ; 15 *John. Rep.*, 270 ; 3 *Martin*, 657 ; 4 *ib.*, 539, 540 ; 2 *vol. of Cowen's Notes to Phil.*, *marked* 3 *vol. of the set, Note ;* 118 *page of the Supplement*, 1545, 1548, where all the cases are collected ; *Chitty on Bills*, 7 ed. 413 ; 3 *Conn. Rep.*, 101 ; 6 *Har. & John.*, 172, 178.

To this general rule, undoubted in the English courts, stated by all the elementary writers, and supported by a series of American cases, there is only one *opposing* case in Massachusetts that I have fallen upon, and one *exception* to the rule. The opposing case has been virtually overruled in Massachusetts, not upon the precise question, but because the later decisions have greatly relaxed the rule, as to competency of parties to notes, even where the action is by the holder *vs.* maker or acceptor, by allowing the drawer or any endorser to be a competent witness ; thus going beyond the decisions in New York and other States.—*See* 11 *Pick.*, 417 ; 6 *Greenleaf*, 390, 394 ; 14 *Pick.*, 44, 47, 48.

The *exception* to the rule is, that where the note was endorsed for the accommodation of the maker, the latter cannot testify between endorsee and endorser. This exception is maintained in some of the cases—and the reason assigned for it is, because the maker would be liable to the endorser in case of judgment against him for the costs in that suit.

Our case would fall within that exception, if it were not relieved, as it is relieved, by two decisive considerations.

1. The first is, that a release for the costs was filed in the cases in the court below, and marked by the clerk of that court as filed, of a date anterior to the verdict and appeal. They have remained since with the papers, and constitute a part of the documents in the cause in court. Of this fact the witness had been notified.

If the particular attention of the court was not called to these releases when the witness was offered and rejected, it was because the court put the rejection on the rule in Walton and Shelly, to which the release could not have been beneficially applied.

2. But the second and unanswerable answer is, that as by our statute the usurious contract is not void even against the usurer, the plaintiff must have recovered the principal of the debt, and the same costs would have followed, whether the usury was proved or not.

So that as the witness's testimony could in no wise have affected his liability for costs, or increased or diminished the amount of that liability, it inevitably results that the witness had no interest in the question of costs.

### Summary of the Foregoing Argument.

1. That the rule in Walton and Shelly is an exception to the rule of evidence of the common law.

2. That in England, where it was introduced, it was speedily abandoned.

3. That the weight of authority in the courts of the States of America, is overwhelmingly against the rule.

4. That where it has been, and is still recognized, in the State courts, it has been so qualified as to apply only to negotiable paper, and in behalf of *bona fide* holders without notice.

5. That the decisions in the Supreme Court U. S., are very superficial on this point, and obviously not well considered, with reference to the learning on the subject, with which the State court adjudications abound.

Winkler vs. Scudder.

6. That the Supreme Court, by limiting the rule to negotiable paper have rejected the civil law maxim of *nemo suum, &c.*, and placed the rule upon the more sensible basis of the policy of the law to protect innocent holders in course of trade.

7. That upon every principle of accurate reasoning, this consequence follows; the limitation of the rule to negotiable paper.

8. That however the Supreme Court may feel at liberty to trench upon the common law, the courts of Georgia are bound by our adopting statute, which also declares that the common law as adopted shall not be changed but by the Legislature.

9. That under our statutes of usury, the innocent holder cannot be affected, although the usury be proved, because the statute makes the contract valid, and punishes the usurer by abating the interest.

10. That by our statute of 1842, the maker as against the usurer, might be a witness in his own case—and that the adoption, construction and application of a rule of law, which would place an innocent endorser in a worse situation, would be alike perversive of all rules of interpretation, and of the legislative mind.

11. That the argument of opposing counsel, which requires *aliunde proof* of the facts of the negotiation, before witness can be heard, is wholly fallacious. That it begs the question and assumes the whole controversy.

12. That the interest of parties to bills and notes is generally balanced; that whatever diversity exists as to the testimony of the endorser, the rule is well settled that the maker is a good witness in an action between the endorsee and endorser.

13. That the question of costs cannot arise in this case.

It is objected that the note given in evidence varies from the special plea. But it is submitted that there is no variance between the evidence and the first special plea. And it is further maintained, that that plea is sufficient to meet the requisitions of our statute.

In England, the defence of usury may be given in evidence under the general issue, in assumpsit or debt on simple contract.—1 *Stra.* 498 ; 1 *Saund*, 295, *b. n.* When it is specially pleaded, the usurious contract must be set forth particularly, according to the facts.—3 *Chitt. plead.*, 909 ; 2 *M.* & *S.*, 377; 3 *Tm. Rep.*, 538.

But if this is not done, and it is plead generally, it can only be taken advantage of upon demurrer.—2 *M. & S.*, 377; 1 *Campb.*, 166. And for the reason, that if the plaintiff pleads over, the court can only try the issue made.

We maintain, however, that the first special plea does sufficiently set forth the usurious contract; and is a compliance not only with the requisitions of our statute as to pleading, but with the stricter rules of English pleading on this subject.

It is objected, that the interest paid by the maker may be recovered back in an action by him or his assignee.

And this is true, if it were not already allowed him by the verdict in this case. If he has had the benefit of this payment, then he is not entitled to recover it a second time. Scudder as the endorser of Thompson, is only liable upon Thompson's failure to pay. But if Thompson has paid on this note an amount of money, Scudder is entitled to have the benefit of the credit; and as the law allows no interest, it is rightly and properly a credit upon the principal of the note.

All which is very respectfully submitted.

ROBERT M. CHARLTON in reply.

1. We say, that Joseph R. Thompson was an incompetent witness to prove the

fact that the note offered in evidence was tainted with usury when he passed it to the plaintiff—because,

1st. A party to a negotiable note cannot be admitted to invalidate it, or to show that it was infected when it passed out of his hands.—*Walton* vs. *Shelly*, 1 *Term. Rep.*, 296; *Chandler* vs. *Morton*, 5 *Greenleaf's Rep.*, 374; *Coleman* vs. *Wise*, 2 *John. Rep.*, 165; *Winton* vs. *Saidler*, 3 *John. Cas.*, 185; *Mann* vs. *Swan*, 14 *John. Rep.*, 270; *Manning* vs. *Wheatland*, 10 *Mass. Rep.*, 506; *Bank of U. S.* vs. *Dunn*, 6 *Peters' Rep.*, 56; *Bank of Metropolis* vs. *Jones*, 8 *Peters' Rep.*, 12; *Henderson* vs. *Anderson*, 3 *Howard's Rep.*, 73; *Griffith* vs. *Redford*, 1 *Rawle*, 197; *Emerick* vs. *Harley*, 2 *Wharton's Rep.*, 51; *Davenport* vs. *Freeman*, 3 *Watts and Sergeant*, 557; *Gest* vs. *Espy*, 2 *Watt's Rep.*, 267; 1 *Greenleaf's Evidence, sec.* 382 *to* 385, *and notes.*

The principle stated in the case of *Walton* vs. *Shelly*, is not a new principle, established by Lord Mansfield then for the first time. The counsel opposed in that case admitted that it was a well established principle, and the court expressly put it on that ground. Our Statute of 1784, therefore, incorporated the principle. It is the case of *Jordaine* vs. *Lashbrooke* that is liable to the bar of that statute.

2d. We say, that the principle upon which the case of *Walton* vs. *Shelly* proceeded, was, that "*nemo allegans suam turpitudinem, audiendus est.*" No one, therefore, can be permitted to show by *his* testimony, that the negotiable paper he has parted with was tainted or infected by usury, or other illegal consideration, *at the time he parted with it.*—*Walton* vs. *Shelly*, 1 *Term. Rep.*, 296; 8 *Peters' Rep.*, 12.

Now this being the foundation of the rule, it will be evident that the distinction which some of the cases seek to draw, that the rule is only applicable when the note is in the hands of an *innocent endorsee*, is not a sound one; *that* might have been an additional inducement; but the true rule that excludes the witness is, that *he* shall not be heard to defeat or deny his own act. An analogous principle is recognized in the common law, which estops a *party* from denying a statement made in a deed, or in other solemn manner; and the rule in *Walton* vs. *Shelly* incorporates the essence of this rule of estoppel, and applies it to a witness who, though not a party to the *suit*, was a party to the *transaction* which his testimony is sought to *impeach*. The rule of the common law as to estoppel is even more stringent than the rule in Walton and Shelly, because it prohibits a party to a deed or other act, from proving anything to the contrary by *any* witnesses. The rule in *Walton* vs. *Shelly* only prohibits such proof coming from the oath of the person who actually committed the act. The *principle* excludes the witness, and so do the well-established cases, even where the party suing is alleged *not* to be an innocent endorsee.

In the case of the *Bank U. S.* vs. *Dunn*, 6 *Peters' Rep.*, the holder, (according to the testimony of *O. Carr*, the witness,) not only knew of the fraud, but originated it; and yet, in that case, the testimony was excluded.—6 *Peters*, 56.

So, in the case of *Coleman* vs. *Wise*, 2 *John. Rep.* 165, the *real* plaintiff had knowledge of the usury, and the distinct point was determined in *Mann* vs. *Swan*, *John. Rep.* 270.

And see *Henderson* vs. *Anderson*, 3 *Howard's Rep.* See particularly pp. 75, 77, 78.

You cannot limit the rule to innocent endorsees, without changing the very principle upon which the rule is expressly based.

Nor can it make any difference, that the witness was the person for whose accommodation the note was made. That strengthens and confirms the principle, because when he transferred it, the note for the *first time* had a legal existence.— *Hartford Bank* vs. *Barry*, 17 *Mass. Rep.* 94,

The very case in 12 *Pickering*, 565, (*Van Schaack* vs. *Stafford*,) which will be strongly relied on by our adversary, admits that it was not really a note, until it

was discounted. With the act of Thompson, therefore, in passing it to Winkler, this note began its legal existence.

3d. But suppose we admit the qualification of the rule, and concede that it is applicable only when it would affect the *innocent endorsee;* still, it was improper to admit the testimony of Joseph R. Thompson at the *time* that it was admitted, and to testify to *that* fact.

Your Honors will remember, that when the witness was admitted to testify, there was not the slightest evidence that the plaintiff was not an innocent endorsee. The only evidence *then* before the court below, was a negotiable promissory note free from any suspicion on its face. Such a note is *prima facie* evidence of value and legal consideration, and imports it until the contrary is shown.—*Bayley on Bills,* 2d *Amer. ed. p.* 492 ; *Chitty, Senr. on Bills,* 8, *Amer. ed. p.* 79.

The general principle of evidence is this : That when a witness has testified to facts, which render him incompetent, or, in other words, where his incompetency has been made out alone by his own testimony, he may by his own testimony restore his competency : but where his incompetency appears *aliunde,* the witness cannot be admitted, either on the *voir dire,* or *in chief,* to remove it.—*Greenleaf's Evidence, Sec.* 423 ; 2 *Cowen Phillipps on Evidence, p.* 260, *Note* 256 ; *Roscoe on Civil Evidence, p.* 80.

Or, to state the rule in the language of the court, in *Griffith* vs. *Redford,* (1 *Rawle's Rep.* 197,) " A witness cannot make way for his testimony *in chief,* by taking his case out of a rule which, *prima facie,* furnishes a valid objection to it."

Now, suppose we take the modification of the rule, as claimed by our adversary, that the principle, in *Walton* vs. *Shelly,* can only be applied where the transfer has been made to a *bona fide* holder for valuable consideration, still, as this paper, upon its face, and upon the presumption of law, (which always imports a valuable and *bona fide* consideration to a note, until the contrary is shown,) has been so transferred for a valuable consideration, and as Joseph R. Thompson, *so long as that state of facts remained uncontradicted,* was inadmissible, *he* was not admissible to disprove that state of facts, so as to make way for his testimony *in chief.*

It would be inconsistent with sound reason to say, that unless a state of facts proved *aliunde,* be disproved, a man shall not be a witness, and yet admit him to prove the very facts that will render him competent. The state of facts rendering him incompetent, having been proved *aliunde,* the facts that will restore his competency must also be proved *aliunde.*—*Mann* vs. *Swan,* 14 ; *John. Rep.* 270; *Griffith* vs. *Redford,* 1 *Rawle,* 197.

The note in this case, therefore, being *prima facie* evidence of good consideration, and of being in the hands of an *innocent endorsee*—and the principle of *Walton* vs. *Shelly* excluding the witness, (even with the modification of the rule,) whilst such note was in the hands of an innocent endorsee—*Thompson* was incompetent to testify at the *time* he was admitted, and for the *purposes* for which he was admitted.

But now, supposing that Thompson was admitted properly, and waiving, for the sake of argument, the rule that we think excluded him, did his testimony prove the facts stated in the plea ? It is perfectly clear that it did not.

The second plea (under which the court below admitted the testimony to the jury) states that the consideration of this note was the usurious interest on the loan alleged therein, " the principal having been paid by the said Joseph R. to the plaintiff."

The principle of law is, that a plea of usury must *precisely* set forth the usurious contract.—1 *Saunder's Rep.* 295, *a. note ; Smith* vs. *Brush,* 8 *John Rep.* 66 ; *Tate* vs. *Wellings,* 3 *Term Rep.* 538.

I am perfectly aware that these cases were in *debt,* and that until the recent rule of *Hilary Term* 4, *William* 4, a distinction was taken between *debt* and *as-*

*sumpsit*, and that, in the latter action, the usury might be given in evidence under the general issue.

But that proceeded upon the unscientific and barbarous principle, (if it can be called one,) that in *assumpsit*, whatever disproved an existing debt, at the time of action brought, might be given in evidence under the general issue.—See *Gould's Pleading*, Chap. vi. Sec. 44 to 51.

This principle, however, has not prevailed in Georgia since the year 1799.— *Prin. Dig. p.* 421, *Sec.* 9; *Longstreet* vs. *Reeside & Fuller, Decisions Superior Courts of Georgia,* 1st Part, p. 39, 42.

And the good sense of the English Judges has abolished it.—See 1 *Chitty's Pleadings*, (9th American edition,) 515 (a) 517 note (h).

The principle which allowed usury to be given in evidence under the general issue in *assumpsit* having been abolished, *usury* must be *pleaded*, and cannot be given in evidence under the *general issue*; and thus, the distinction being broken down between *debt* and *assumpsit* in this regard, the rule that requires all the particulars of the usurious contract to be *precisely* set forth, is as applicable to such plea in *assumpsit*, as well as in *debt*.

The usurious contract must not only be correctly set forth, but it must be fully, and fairly, and distinctly set forth.—*Hill* vs. *Montague*, 2 *Maule and Selwyn*, 377.

(In Georgia we have no demurrer at common law—the objection must be taken by objecting to the evidence offered under it.)

And this is in obedience to the rule of pleading that " in general, what is alleged in pleading must be alleged with certainty."—*Stephens on Pleading*, 3d *Amer. Edit.*, *p.* 333, also page 337 *top page*.

And in *Georgia*, the statute of 1799 requires this fullness.—*Prince* 421; *Sec.*, 9.

And it is more especially necessary that it should be full and correct here, where no special pleading is allowed—where the parties are compelled to go to trial upon petition and plea, and the real point cannot be brought down by replication and rejoinder, &c.

Now this plea is a mere general one of usury, without stating the time when, the amount loaned, or the manner in which it was loaned. It is liable, and with more force, to the objection taken in *Hill* vs. *Montague*.

And it is liable to the further objection, that it does not correctly set forth the consideration for the note sued on, but declares, " that the consideration of this note is the usurious interest on the said loan, the principal having been paid by the said Joseph R. Thompson, to the plaintiff"—a fact wholly disproved by the testimony of said Joseph R. Thompson, the payments having been made on account of the *interest* exclusively, and the note in suit being expressly given for the *principal* alone. Even admitting that the payments made for interest were, by legal operation, to be applied to the principal, (a point which we will hereafter controvert,) still the plea is not true ; for a large part of the principal confessedly remains due, and is so found by the jury.

For these reasons of variance between the *allegata* and *probata*, the testimony should have been excluded from the jury.

3. Another ground of objection remains. The witness proved that when plaintiff first loaned the money to him upon discount of the original note, he paid witness the amount, less the usurious interest. In all the subsequent renewals, witness paid the usurious interest in cash.

1. These were voluntary payments, and as such they could not be recovered back.—*Archbold's Nisi Prius*, 49 ; *Law Library*, 197, *also* 203.

There is no forfeiture for taking more than 8 per cent. The law does not make the contract void, it says it shall not be void, but it will not allow you to recover, by *legal process*, any more. It gives you no remedy to recover more. But if you can get it without legal process, if it be paid voluntarily, it cannot be recovered

back from you.—*Prin. Dig.* 295.    And however this may be as to the illegal excess, yet all the authorities say that the legal interest, voluntarily paid, cannot be recovered back.    Indeed, the excess cannot be recovered without offering to pay the principal and legal interest.

2. If they could be recovered back, it could only be by Thompson, or his general assignee in bankruptcy, and not by the defendant Scudder, who had never paid them.    The plaintiff could not be exposed to the danger of being sued by two persons in separate actions for the same cause of action.

Besides, there was no privity of contract as to the money paid between plaintiff and defendant; and if there were, this is not an action brought to recover back the money paid.

3. There was not the slightest testimony that any payment was ever made on account of the *principal.*    All the payments were expressly made on account of the *interest.*    The court below erred, therefore, in refusing to charge, as plaintiff's counsel requested, and in leaving it to the jury to say how much of the principal had been paid.    The court has no right to submit a hypothetical question to a jury, when there has not been the slightest evidence to the point.—10 *Wendell,* 461 ; 4 *Wendell,* 639 ; *Graham on New Trials, p.* 261 *et seq.*

We submit, therefore, in conclusion :—

1st. That a party to a negotiable note cannot be permitted to show that there was any invalidity when it passed out of his hands, and that, therefore, Joseph R. Thompson, the witness, was improperly admitted.

2d. That if the rule above claimed be limited to cases where the note sued on is in the hands of an innocent endorsee, that the *aliunde* proof when Thompson was admitted raised the legal presumption that plaintiff was an innocent endorsee, and until that *aliunde* proof was disproved, Thompson could not, upon legal principles, be a witness, and he could not be admitted a witness to disprove this *aliunde* proof, and therefore that he was improperly admitted to testify.

3d. That if Thompson was a competent witness, yet that the facts stated by him did not coincide with the statements of the pleas of the usury ; and that as the *allegata* and *probata* did not agree, the said testimony should not have been permitted to go to the jury.

4th. That there was *no* evidence that any part of the *principal* of said note had been paid, and therefore under any circumstances, the plaintiff was entitled to a verdict therefor—and that the court below erred in refusing so to instruct the jury, and in leaving the question to them.

*By the Court*—NISBET Judge.

Suit was brought in Chatham Superior Court, by Z. M. Winkler, the plaintiff in error, against Amos Scudder, an endorser upon a promissory note.    The plea af usury was filed, and Joseph R. Thompson, the maker, was called to prove it, and his testimony admitted.    The first assignment of error is " That a party to a negotiable note cannot be permitted to show that there was any invalidity in it when it passed out of his hands, and that, therefore, Thompson was improperly admitted."

In England this question was settled before the statute of Victoria. Long before that act the rule as laid down by Lord Mansfield in Walton and Shelly was repudiated, and the rule as settled in Jordaine and Lashbrooke, by Lord Kenyon ; acquiesced in by the people, the profession and the courts.    The history of this question in England is this : Lord Mansfield in Walton and Shelly in 1786, determined that a party to a negotiable security or instrument, could not be a witness to impeach its validity.    This decision applied to *all* instruments without qualification

or exception, and embraced all written contracts, deeds and wills, as well as negotiable securities.    A few years afterwards in Bent and Baker, the rule received its first modification and was in that case limited by Lord Kenyon to negotiable paper.    In 1798 in the case of Jordaine and Lashbrooke, the cases of Walton and Shelly and Bent and Baker, were overruled, and the rule established by them exploded.    Since that time there has been in England no controversy about the matter.    Both at common law and by statute, a party whose name appears to any instrument, is held competent to impeach its validity.    So much for the authority of the rule as recognized in England.    Let us now look into the sufficiency of the reasons upon which it is founded.    All great questions ought to be settled in consonance with reason as well as authority.    Authority is controlling only so far as it is sustained by principle.    No questions concern the rights of the people more directly and intimately, in the administration of justice, than questions of evidence.    In the language of Lord Kenyon, " on the rules of evidence depend those facts which are introduced in every case and therefore it is of the utmost importance to preserve those rules."    Evidence is for the ascertainment of facts, and facts enforce or inhibit justice.

In Walton and Shelly Lord Mansfield placed the exclusion of the witness upon two grounds, to wit : public policy, and the maxim of the civil law, " *nemo allegans suam turpitudinem audiendus est.*"    " But what strikes me, says this great lawyer, is the rule of law founded upon public policy, which I take to be this : that no party who has signed a paper, or deed, shall ever be permitted to give testimony to invalidate that instrument, which he has so signed, and there is a sound reason for it, because every man who is a party to an instrument gives a credit to it.    It is of consequence to mankind that no person should hang out false colors to deceive them by first affixing his signature to a paper, and then afterwards giving " testimony to invalidate it."    He illustrates his meaning by referring to a gaming note in the hands of a bona fide purchaser, without notice, and to a note given for a usurious consideration, in the hands of a fair endorsee.    " The public policy," which he had in his mind, was the commercial policy of Great Britain, and particularly in reference to negotiable securities.    This is manifest from the illustrations which he gives.    Lord Mansfield is considered the father of the commercial law.    And so magnificent a system is worthy its illustrious parentage.    It required just such a mind, original, bold, and elaborately cultivated, to engraft upon the British common law those principles which now constitute the body of the law merchant.    The condition of Great Britain in his day required the improvements in this regard, which he made.    They were necessary to sustain her rapidly growing trade and various commercial pursuits.    She was then throwing off the restraints of Federalism, and multiplying the industrial pursuits of her people.    She was then, in fact, a great commercial State.    Lord Mansfield felt the impulse of the age and sustained it, by a long series of wise decisions.    He had a zeal for the commercial policy of England, which seems to have pushed him occasionally into extremes.    And the decision now under review is an illustration of it.    The rule was impolitic in the judgment of British courts and lawyers, as is proven in its early repudiation.    But admitting that public policy in England, at that day, made such a rule of evidence ne-

Winkler vs. Scudder.

cessary, we deny that at this day, and in our country, it is necessary. If the rule established in Jordaine and Lashbrooke is sufficient for the commercial policy of England, it is of course sufficient for the commercial exigencies of Georgia.   Although the mercantile interest here is great, our agricultural interests are paramount.   Ours is an agricultural community.   Negotiable securities are here under the law regulating bills of exchange and promissory notes, as well as the great interests represented by them, sufficiently protected, without the aid of Lord Mansfield's rule of exclusion.   They do not need the encouragement which that rule affords, and, therefore, the reason for it, founded in public policy, does not seem at this day and in this country to apply.

The exclusion of a party to a paper was designed to encourage commerce by discouraging Fraud.   We concede that it is of consequence to mankind that no person should hang out false colors to deceive them.   He who negotiates a note for value, knowing it to be invalid, without disclosing the fact, is guilty of a fraud upon his endorsee and upon mankind, as well as an act of heinous immorality.   This cannot be questioned.   Yet it may be questioned whether his exclusion has the tendency to discourage such fraudulent acts.   Entrenched in legal forms, he is protected from that public censure and indignation to which his own revelation of the facts would inevitably expose him.   Such immunity is not likely to discourage fraud.   It conceals and disguises fraud, by withholding the only witness who can develope it.   The rule too operates injuriously upon parties defendants, who being entitled to certain defences by law, are yet unable to avail themselves of them by the exclusion of the only witness who may be cognizant of the facts upon which they rest.   The rule further enables the party plaintiff holding an instrument, to perpetrate a fraud, by getting the only witness knowing of its invalidity, to put his name upon it, and thus silence him forever.   The argument founded upon the discouragement of fraud, is equally balanced to say the least of it.

The objection founded on the maxim of the Roman Law, is not as we believe strong enough to exclude the witness—not so strong as to overrule those considerations of right and policy, before urged in favor of his competency.   The spirit of the maxim " *nemo allegans*, &c.," seems rather to apply to parties than to witnesses.   No one who comes into court alleging his own immorality, and on that account claiming a benefit, ought to be heard.   A witness who is brought there, and speaks for the benefit of others, stands upon different grounds.   Objections of this sort, founded in the want of character, lie to the credibility rather than to the competency of witnesses.   The courts of justice in England led the way for the sweeping statute of Victoria.   They were in advance of the Legislature, and were fast verging to the ground finally taken by Parliament.   That is, to the admission of witnesses without regard to character ; having the weight of their testimony to be judged of by the jury.— *Greenleaf*, 452–3, *Note* ; 2 *Starkie on Evid.*, 9, 10 ; 2 *Hale P. C.*, 280 ; 11 *East* 309 ; 5 *M. & S.* 244.   In this country this waiver of all objections upon this ground to competency, would be safe.   We might well trust almost any one to testify before the juries of our country.   The modern practice is in accordance not only with the spirit of the age, but with the genius of our institutions.   The maxim of the civil law, if it applies at all to the case before us, applies with greatly mitigated force.   Here the

9

borrower of money, in behalf of his own endorser is called to testify, to sustain a plea of usury. Laws against usury are conservative of public morality, and he is called to support them. The morality of the borrower, who pays or contracts to pay, illegal interest, is nothing like so great as that of the lender who receives it. He is not strictly " *in pari delicto.*" Particularly when we consider that our statute against usury is not penal, but inhibitory.

Let us inquire now how this question stands in the United States. Here it is admitted, there has prevailed and in fact still prevails, much conflict of opinion and authority. The rule of Walton and Shelly seems at first to have been adopted in most of the States, and now prevails with modification in the Supreme Court. Several of those States, which first adopted the rule of exclusion, and among them the great commercial States of New York and Massachusetts, have gradually receded from it. And now, we have no hesitation in saying that the authority of the States is against that rule—whether considered in reference to numbers, the standing of the courts, or the learning of the judges. In Winton *vs.* Saidler, New York fully adopted the Walton and Shelly rule.—3 *Johns. Cas.* 185; 14 *Johns. Rep.*, 270. In 18 Johns. Rep., 167, the court takes the ground that " the reason and policy of the rule was to protect *bona fide* holders. In Tuthill *vs.* Davis, 20 Johns. 287, the endorser in a suit against the maker, was admitted to prove that the note sued on was given in discharge of others, tainted with usury. And here Walton and Shelly was abandoned.—*See also* 5 *Cowen*, 23; *Ibid.*, 153; 3 *Wend.*, 415. In Massachusetts the Walton and Shelly rule is confined to *bona fide* holders without notice. In the case of Fox et al. adms. *vs.* Whitney, 16 Mass., 118, the action was brought by the administrator of the payee of a note against the administrator of the maker. The plea of usury was filed and the security on the note called to prove it and admitted. Parker, C. J. said : " The rule by which parties to notes are excluded from being witnesses, to discredit the security to which they have given currency, does not apply to the case before us. Such witnesses are excluded upon the ground of policy, because in fact their testimony goes to contradict their own acts. It applies only to negotiable securities." The Chief Justice proceeds to say, that it is applicable only to innocent holders of negotiable securities. In Massachusetts, therefore, as between the original parties, the rule of admission obtains. It was so adjudged in the case last referred to in a state of facts precisely similar to the state of the facts in the case at bar. It may be remarked here that in very few, if any, of the States, does the excluding rule apply in its original extent. Where it obtains at all, and to this extent it does obtain in many of the States, it is confined to negotiable paper in the hands of bona fide holders without notice. For the history of this question in Massachusetts, see 4 *Mass. R.* 162 ; 7 *Ibid.*, 199 ; 11 *Ibid.*, 375, 498 ; 16 *Mass.* 118 ; 3 *Pick.* 184 ; 10 *Mass.* 560 ; 12 *Pick.* 565.

The doctrine, as held in Jordaine and Lashbrooke is enforced in Virginia, 3 *Randolph*, 316. In Connecticut, 1 *Conn.* 260. In South Carolina, 3 *McCord*, 71. In Tennessee, 2 *Yerger*, 35. In Maryland, 3 H. and J. 172. In New Jersey, 2 *Harrison*, 192. In North Carolina, 3 *Murphy*, 151. In Alabama, 1 *Stew.* 199 ; 9 *Porter*, 226. In Kentucky, 3 *Little*, 221. The rule of Walton and Shelly limited to negotiable securities, in the

hands of bona fide holders without notice, is held in the Supreme Court of the United States.—6 *Peters*, 51, 57 ; 8 *Peters*, 12 ; 11 *Peters*, 86, 94, 95 ; 12 *Peters*, 149. In Massachusetts as before explained. In New Hampshire, 2 *N. Hamp. R.*, 212. In Maine, 4 *Greenleaf*, 191 ; 5 *Greenleaf*, 374. In Pennsylvania, 6 *Watts*, 498 ; 8 *Watts*, 304. In Mississippi, *Walk.*, 541. In Louisiana it is supposed that the rule is unsettled ; so in Vermont ; so in Illinois ; so in Ohio.

The authority of Walton and Shelly was considered by the judges of our own State in the case of Slack *vs.* Moss, many years ago, at a time when the circuit benches were occupied by men whose integrity and learning have not been questioned ; and at the head of whom was the late eminent Judge Crawford. They rejected the authority of that case, and it is believed that the courts of Georgia have very generally acquiesced in their decision.—*Dudley*, 161.

The authority of the Supreme Court has been invoked in behalf of the plaintiff in error, with great strength of reasoning and eloquence. It is claimed that the Supreme Court is the highest and most authoritative tribunal known to our Union, and that its decisions form an elevated rallying point for the courts of the States. That with a view to uniformity and harmony, it is better for this court to conform to its decisions, than to abide by the authority of other courts, however imposing in their organization, or distinguished by their learning. We promptly and cheerfully admit the commanding character of our great national tribunal—the ability of its judges and the desirableness of harmony between it and the State courts. One answer to these views is to our minds conclusive, and that is—the decisions of the Supreme Court are not the law of this court—the common law as it stood in May, 1776, is. To this branch of the argument we shall again advert. Aside from this fact, the decisions of the Supreme Court upon this subject, come to us as naked adjudications—without reasoning—without any attempt at a collating and balancing of authorities. They seem to be rather in character of *dicta*, than solemn judgments. Their authority is that of the court, and not of argument or learning.

The court, seems, in no instance, to have been desirous of settling this vexed question by authority or reason ; but to have been content with the annunciation of its own opinion, the meagerness of these decisions, must strike the most careless reader. This is the more remarkable, since at the time of giving them, a contrary doctrine prevailed in England, and in many of the American States. We pretend not to account for the fact. We only know that such is the fact.

Now the authority of the Supreme Court is, in this court, the moral power of reason and the weight of legal learning. Upon this question it is not commended to us by either, and must yield to other considerations, which we esteem as conclusive upon us. Besides we do not know how long that court will hold to its present opinions—it may recede from them, as it has receded from the doctrine first ruled in the case of the *Bank of the United States* vs. *Dunn*, in 6 *Pet.* 51. The court adopt there the doctrine of Walton and Shelly, in these brief words, " But it is a well-settled principle, that no man who is a party to a negotiable note, shall be permitted, by his own testimony, to invalidate it. Having given it the sanction of his name, and thereby added to the value of the instrument by

giving it currency, he shall not be permitted to testify that the note was given for a gambling consideration, or under other circumstances which would destroy its validity. This doctrine is clearly laid down in *Walton* vs. *Shelly*, reported in 1 *T. Rep.* 296, and is still held to be law, although in 7 *T. Rep.* 56, it is decided, that in any action for usury, the borrower of the money is a competent witness to prove the whole case." Now it is very remarkable that the court should declare that it is a *well-settled principle*, &c., when, so far from the principle being settled in England, it had been overruled by Lord Kenyon in *Jordaine* and *Lashbrooke*, and was not, at the time, the law of the British courts; nor was the principle a settled one, by any means, in the United States.

The court, in 11 *Peters*, 94–5, more explicitly limit the rule to negotiable instruments, and put it upon the ground " of the *currency given to* them by the name of the witness called to impeach their validity." The authority, therefore, of the Supreme Court does not extend to the exclusion of the witness in a case like that we are now determining, between the original parties. For here the lender is suing the endorser upon a note which he had discounted, and which had never been in circulation.

By what is called our adopting statute, passed in February, 1784, the common law of England and such of the statute laws as were usually of force in the province of Georgia, on the 14th day of May, 1776, are declared to be in full force, virtue, and effect, and binding on the inhabitants of the State, so far as they are not contrary to the Constitution, laws and form of government of the State.—*Hotchkiss*, 93. This statute makes the common law of England obligatory upon this court. The obligations of office, and the oath of office, require us to enforce it as it stood in 1776. If, before that period, the rule of evidence was that all sane persons were competent to testify, unless excluded by interest, or conviction of an infamous offence; if interest and infamy were the only exceptions to the general rule known in 1776; we do not perceive that we have any discretion in the matter. We are bound absolutely to administer the common law as it was *then usually of force*.

The case of Walton and Shelly was some ten years after the 14th of May, 1776. It is contended however, that the rule of Walton and Shelly was the law before its enforcement in that case by Lord Mansfield. We think not; but believe that it created an additional exception to the general rule. In Jordaine and Lashbrooke, Lord Kenyon says : " I have always understood the rule to be, that where a witness is infamous and his record of conviction is produced, or where he is interested in the event of the cause, he cannot be received ; but to carry the rule beyond that, would be extending it further than policy, morality, or the interest of the public require." His attention was particularly called to the rule of Walton and Shelly, in consequence of his having been reported in Bent and Baker, as sustaining it. That report he disclaims, and says *expressly* that he has not been enabled to find any case before that of Walton and Shelly, excluding the witness, and that " he cannot bring his mind to accede to the authority of that case." Now, here is the authority of Lord Kenyon, as to what was the common law, before the case of Walton and Shelly. It was said in the argument that the case of Jordaine and Lashbrooke was determined upon principles growing out of the revenue laws of Great Britain. The case of Jordaine and Lashbrooke was founded on a

bill of exchange, on its face purporting to be drawn at Hamburg.  By statute, all bills drawn within the realm, of certain amounts, were liable to certain stamp duties, and bills drawn upon other than stamp paper were declared void.  The witness was called to prove that the bill purporting to be drawn at Hamburg, was in fact drawn in England, and void by statute for want of a stamp.  The bill as offered in evidence was a fraud upon the revenue laws of England, and it is true, that several of the justices laid great stress upon this fact, but Kenyon, the master mind of that court, scarcely adverted at all to that view of the subject.  He rested upon the common law rules of evidence, and his associates, except one, sustained him upon those rules.  Groce, Justice in this case, declares, "Before the case of Walton and Shelly, I never read of this ground of incompetency."  It is very clear that the question in Jordaine and Lashbrooke, received a most able and careful review ; and we must believe that if anything is settled by that case, it is, that Walton and Shelly is an innovation upon the common law, as it stood at the time.  To this conclusion the judges came in Slack and Moss.  We are therefore of opinion, upon any view of the question, that the witness in the court below was properly admitted.

The second assignment of error assumes that from the face of the note, the plaintiff being an endorser, is an innocent holder ; and limiting the rule in Walton and Shelly to negotiable securities, in the hands of an innocent holder, Thompson, the maker, ought not to have been admitted until by other testimony it was made to appear that plaintiff is not an innocent holder.  If the witness is competent at all, he is as much competent to prove the circumstances under which the note was negotiated, and how the plaintiff became connected with it, as he is to prove the usurious consideration.  For this purpose he is called.  If the rule of Walton and Shelly, as modified in New York, governs this case, then indeed, upon the hypothesis that the plaintiff is an innocent holder, the witness would be excluded.  But how shall it appear that the plaintiff is an innocent endorsee, a bona fide holder without notice.  It does not necessarily appear from the face of the paper.  The witness is called to testify as to this fact, and the question recurs, is he competent.  It is a question of competency still.  The view taken in the assignment supposes the defendant able to prove by others what he calls the maker to prove, and if so why call him at all.  This is begging the question.  If indeed it should be conceded that a party to a note cannot be permitted to impeach its validity in the hands of an innocent holder, still no injury could in practice result from the examination of the witness as to the circumstances under which the plaintiff came into possession of the note, for if it should appear from that examination that he was an innocent holder, the whole of the testimony could be withdrawn from the jury.  That in every case the question is one in the very outset of competency, is demonstrated from the character of those reasons which Lord Mansfield gave for excluding the witness.  These reasons are drawn from the fact that his name appears on the instrument.  They show the impolicy and immorality of a party whose name so appears testifying at all.  Lord Mansfield was called to pass upon the competency of the witness from the face of the instrument, and so are we.  With great respect for the learned

counsel for plaintiff in error, we are compelled to believe that this second assignment is but a different form of exhibiting the first.

The third assignment asserts " that, admitting the competency of Thompson, yet the facts stated by him did not coincide with the statements of the plea of usury, and that as the *allegata* and *probata* did not agree, his testimony should not have been permitted to go to the jury. To understand the force of this exception, and the answer we shall make to it, it becomes necessary to state, that the plea of usury filed by the defendant was confessedly too vague and general, and particularly defective in two particulars : *First,* the original amount of the loan was not stated, and *second,* the time at which the money was borrowed was not stated. There was no demurrer to the plea on these accounts, no demurrer on any account, the defendant replying to the plea and joining issue upon it before the jury. The testimony was, among other things, that the note sued on was given for the interest reserved. It was argued that the testimony ought to have been withheld because the plea did not comply with our act of '99, in plainly, fully and distinctly setting forth the defendant's cause of defence, and if it did there was a variance between the plea and the proof. We think the plea did not fully comply with the requirements of the statute.

This court in the case of *Johnson et al.* vs. *Ballingall, ante* p. 68, determined in May last, at Milledgeville, that our statute requires so plain, full, and distinct a statement of the grounds of defence, as to put the plaintiff accurately into possession of all the grounds relied upon. We think that our statute was intended to do two things. First it abolishes the technical pleading of the English practice ; and second, it inhibits the proof of any special defence under the general issue. Whilst it does not require either the form or particularity of the British courts, yet it does require a clear, full and true statement in reciting the grounds of defence. It is impossible to lay down a general rule, by which the sufficiency of the plea can, in every case, be determined. Each plea must be determined according to its character and the circumstances of the case. All *material* facts ought to be set forth in all : particularly in pleas of usury. The amount of the original loan and the time when it was negotiated, are material facts. Material because, without these it would be impossible to ascertain the amount of usurious interest received or paid. We are therefore very clear that the plea in this case was not full enough. It was the right of the plaintiff to demur to the plea for a want of fullness and distinctness ; and having failed to do so, having joined issue upon it before the jury, he is too late in his exceptions. Had he demurred, either the plea would have been stricken out altogether, or the defendant would have been driven to amend. But it was insisted in the argument that, under our practice, established under the Act of 1799, there is no such thing as demurrers at law. We think differently. We do not demur, it is true, formally, and in writing, nor is the judgment upon the demurrer formally pronounced, and entered, as in England ; we demur orally, and the effect of the demurrer, if sustained, is that the plaintiff's writ or defendant's plea be dismissed, unless in cases where either is amendable.

Nor do we think that the common law rule of variance, as applicable to the plaintiff's allegations and proof, applies here to defensive pleadings. The plaintiff is protected in his right to have *a sufficient* plea in

his privilege of demurrer. If he consents to go to the jury on the plea, the jury must determine as to the applicability of the evidence to the plea. We cannot, therefore, sustain this exception.

The last exception is in these words, "That there was no evidence that any part of the principal of said note had been paid, and therefore, under any circumstances, the plaintiff was entitled to a verdict therefor; and that the court below erred in refusing so to instruct the jury, and in leaving the question to them." Upon the trial, the record shows, that the amount of the loan was proven, and also the amount of interest which had accumulated, both lawful and usurious. The jury in their verdict credited the plaintiff's demand with the interest, and found the balance for him. The ground assumed in this exception, if we correctly understand it, depends upon a construction of our statute of 1822. We do not know that the jury believed, from the evidence, that no part of the principal was paid; but suppose they did; then the argument is as follows:—viz. The payments made upon this contract were in extinguishment of the interest: the Act of 1822 does not make the contract void, but only inhibits the collection of anything but the principal; it only denies to the plaintiff a process to collect the interest. The interest in this case being voluntarily paid, the defendant could not maintain his action against the plaintiff for money had and received, and therefore is not entitled to have a credit for the interest when the action is against him on the contract. We confess that this construction of the Act of '22 is exceedingly plausible, and it was not without difficulty that we arrived at the conclusion to give to it a different construction. We think, however, that a just construction of the Act, making all usurious contracts, established to be such in a court of law, void as to the lawful interest and the usurious interest. When a party comes into a court of justice to enforce a usurious contract, the Act visits upon him a forfeiture of the interest, which upon other contracts it allows him to recover: in other words his principal bears no interest. And as we must infer that the jury in this case, believed that the sum which remained due was made up of principal and interest, they did right in abating the lawful interest. As to the excess, thinking as we do that the contract was void as to that, the plaintiff has recovered it contrary to law and good conscience, and an action would lie for the defendant to recover it back; and if so, he can recover it in this action, in the form of a credit, found by the verdict of the jury, upon the plaintiff's demand sought to be enforced against him. So the judgment of the court below must be affirmed upon all the exceptions taken.